UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

SAMUEL MCGEE,

    Petitioner,

v.                                      Case No. 15-C-503

UNITED STATES OF AMERICA,

    Respondent.

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

This case was remanded by the Seventh Circuit for an evidentiary hearing to determine whether the Petitioner had told his trial lawyer, Henry Schultz, to appeal his conviction. Following the remand, this court appointed counsel to represent the Petitioner. A hearing was held on January 3, 2017, and the parties have now filed post-hearing briefs. For the reasons given below, I conclude that the Petitioner's version of events was not credible.

**I. Testimony**

At the beginning of the two-hour hearing, the Petitioner took the stand and testified that he understood there had been no appeal waiver in his plea agreement.[1] (ECF No. 39 at 5.) He stated

---

[1] To show that he received ineffective assistance of counsel at trial, the petitioner has both the burden of proof and persuasion to show that his lawyer "made errors so serious that counsel was not functioning as the 'counsel' guaranteed ... by the Sixth Amendment ... [and] that the deficient performance prejudiced the defense." *United States v. Davenport,* 986 F.2d 1047, 1049 (7th Cir. 1993) (quoting *Strickland v. Washington,* 466 U.S. 668, 687 (1984)). Regardless of which party bears the burden, I would reach the same conclusion.

that he and Schultz discussed a possible appeal because the Petitioner wanted to dismiss the count brought under 18 U.S.C. § 924(c) for using a firearm during a crime of violence. (He later testified that he felt like he was being charged twice for the same crime. (*Id.* at 20.)) Schultz told him appealing that issue was impossible, but the Petitioner persisted and testified that he wanted to be able to appeal nevertheless. (*Id.* at 6.) Prior to sentencing, the Petitioner met with Schultz and told him he was concerned about possibly facing 11 ½ years of confinement and that he wanted to file an appeal. According to the Petitioner, Schultz said "okay, no problem, we'll file the appeal." (*Id.* at 8.) Following the sentencing, at which he indeed received 11 ½ years, the Petitioner was distraught and did not speak with his attorney about an appeal, or anything else.

Eventually, after landing at Leavenworth prison and getting settled, the Petitioner states that he began researching matters in the prison's law library. (*Id.* at 11.) When another inmate asked what was going on with his appeal, he said he didn't know. According to the Petitioner, it was at that moment when he realized the appeal time period was only 14 days, and so he wrote a letter to Schultz asking about the status of his appeal (which Schultz had not filed). Eventually the two of them talked, and the Petitioner stated that he simply didn't understand how it would be possible for his lawyer to decide not to file an appeal when the two of them had already decided to file one. (*Id.* at 13.) Following their discussion, the Petitioner stated that he wrote a letter to the courts to "get verification to find out that my appeal wasn't filed." (*Id.* at 14.)

On cross-examination, the Petitioner admitted that, having already discussed the matter with Schultz, he knew no appeal had been filed at the time he wrote to the courts. He explained that "I did know that no appeal had been filed. But I was ensuring that everything was covered." (*Id.* at 17.) However, as counsel for the government pointed out, his inquiry letters to the courts made it

2

seem that he did *not* know that no appeal had been filed. In one, he asked for the status of his direct appeal and stated that "I have been awaiting information as to a briefing schedule and yet [sic] have received any documentation." (*Id.* at 18.) Since such an inquiry appears strange given that he knew no appeal had been filed, the Petitioner explained that he wrote to the courts in order to create a "paper trail or document record . . . to show that you had interest in your appeal." (*Id.* at 19.)

The Petitioner also admitted that any possible issues for appeal relating to § 924(c) "kinda went out the window" due to his plea to both counts. (*Id.* at 20.) Instead, the issues he wanted to appeal were the length of his sentence — he felt it was unfair that a codefendant received 9 years when he was given 11 ½ years — as well as the restitution that was imposed. Upon examination by the court, he stated that by appealing he simply wanted to obtain a "second opinion" on those issues. (R. 36.) But these concerns appear to be retrospective ones. At the time of sentencing (when he allegedly instructed Schultz to file an appeal), he "didn't have any particular issues that I wanted to appeal." (*Id.* at 25.) Despite not having any specific issues to appeal, the Petitioner stated that his attorney, prior to sentencing, assured him that he would file an appeal. (*Id.* at 25-26.) Since they never talked in the days and weeks after the sentencing, Schultz never learned what issues the Petitioner wanted to appeal. (*Id.* at 29.) The Petitioner explained that he thought it was Schultz's job to know which issues to appeal, and so it was not his own responsibility to tell him.

Attorney Henry Schultz also testified. He conceded that he had extensive discussions with the Petitioner regarding an appeal. (*Id.* at 43.) But these discussions had centered around pretrial matters, including an extensive suppression motion that involved three days of hearings and written briefs. They discussed the possibility of a conditional plea, whereby they reserved the right to appeal the adverse suppression decision, but ultimately they decided to sign a non-conditional plea

3

in exchange for the prosecutor lowering his sentencing recommendation. (*Id.* at 44.) Schultz also testified that they did discuss appealing the sentence itself, but prior to sentencing the Petitioner never stated that he wanted to appeal. (R. 46-47.) The government was asking for 11 ½ years, and the defendant had asked for 10 years, and so in Schultz's mind the 11 ½ year sentence McGee actually received was in line with everyone's expectations and was something that "would not be overturned on appeal." (*Id.* at 48.)

Immediately following the sentencing, Schultz offered to talk with the Petitioner, who declined to communicate. (*Id.* at 49.) He testified that had there been any issue he thought was appealable, he would have pursued that conversation. Schultz had no contact with McGee until the following October, when McGee wrote him a letter. When the two of them talked, Schultz testified, he told McGee that McGee had not asked him to file an appeal. Schultz stated that in thirty-five years of practice, including supervising the public defender's office, he has filed appeals for many clients before, and filing an appeal is a fairly easy thing to do. (*Id.* at 69-70.) Thus, he would have done so had the Petitioner wished.

**II. Evaluation of the Testimony**

As noted at the outset, I did not find the Petitioner's version of events to be credible. First, although it could be argued that both McGee and Schultz have something to gain from their own stories, that does not mean they are equally believable. Schultz could be viewed as defending his own professional reputation and competence by testifying that he did not ignore his client's wish to appeal. However, as a career defense attorney he has dedicated himself to the rights of criminal defendants and, as an officer of the court, he has an ethical obligation to be forthcoming, even about possible mistakes. The Petitioner is under no such obligation and lacks the longstanding

4

professional interest in defending those accused of crimes. Moreover, as established during and before the hearing, Schultz spent quite a bit of time supporting his version of events — not just testifying but digging through old notes and files — when it would have been far simpler to acquiesce in his former client's story or claim a bad memory.

In contrast, these proceedings are something of a diversion for McGee, who appears to believe he would get a "second opinion" on his sentence if he could have his appeal rights reinstated. His interest in perpetuating the story that he told Schultz to appeal is therefore manifest. Therefore, McGee's story comes across as self-serving. Being self-serving does not automatically mean a story is false, but it makes it more difficult to believe in the absence of other compelling and supportive facts, as discussed below.

Second, the circumstances of McGee's case do not support McGee's story. He claims that, prior to sentencing, Schultz essentially told him "okay, we'll appeal" even though Schultz had no inclination as to any issue that was even appealable. Any appeal must identify specific claims of legal or factual error. Contrary to McGee's view, an appeal is not simply a chance for another court to give a "second opinion" of the case—the appellate court must be alerted to legal errors that were committed. At the time McGee says Schultz agreed to appeal, McGee had not even been sentenced yet. Given those circumstances, it is difficult to believe that a criminal lawyer with more than thirty years of experience would glibly agree to file an appeal without knowing what, if any, issues were appealable. That is simply not how things work. "[C]ounsel for an appellant cannot serve the client's interest without asserting specific grounds for reversal." *McCoy v. Court of Appeals of Wisconsin, Dist. 1,* 486 U.S. 429, 436 (1988).

Third, and relatedly, McGee has yet to identify any issue that would have made sense to

5

appeal. In the normal course, counsel and a defendant would discuss matters that could possibly be appealed and then decide whether to proceed or not. Here, all we are left with is a generic statement that McGee wanted to appeal *something*—but he had no idea at the time what issue might have been a possible candidate for appeal. Instead, the issues he has now identified did not arise until sentencing or later, and so they would not have been part of the discussion with Schultz that occurred *prior* to sentencing. In short, when a defendant lacks a specific issue to appeal, it is less likely that he actually believed he had obtained an agreement from his lawyer to file an appeal. Moreover, it must be remembered that counsel is under an ethical obligation to avoid filing frivolous appeals. It strains credulity that Schultz, an experienced criminal lawyer, would simply say "okay, we'll appeal" without having any inkling about *what* to appeal. "An attorney, whether appointed or paid, is therefore under an ethical obligation to refuse to prosecute a frivolous appeal." *Id.*

Fourth, there is evidence in the record that McGee was attempting to create some kind of *ex post facto* paper trail to bolster his claim rather than being genuinely confused about his appeal status. Cross-examination elicited the fact that despite his knowing no appeal had been filed, McGee wrote to the courts asking about the "status" of his appeal, even to the extent of seeking information about scheduling. Given that he already knew there *was* no appeal, the letter purporting to be confused about scheduling was itself misleading to the courts, which undermines his credibility with *this* court. He conceded that he did this in order to show the courts that he was interested in his case rather than out of any genuine desire to learn about an appeal he knew had not been filed. Rather than supporting his claim that he had instructed Schultz to appeal, his course of conduct left this court with the distinct impression that, once McGee landed at Leavenworth, he

6

developed second thoughts about his decision to plead guilty and decided to see if there were any means of reversing course. Someone apparently told him to start writing letters to courts in an effort to make it seem like he was confused or that he had been let down by his attorney. But, in their full context, the letters he wrote are suggestive of an attempt to manufacture confusion rather than evidence of a genuine misunderstanding about the filing of his appeal.

      Finally, it is curious that he testified he was doing research in the law library when it dawned on him that he should check on the status of his appeal. Specifically, he testified that he became concerned about his appeal after he "got involved in the law library and [was] researching what to do with my case." (*Id.* at 11.) It was only when another inmate suggested he contact his attorney that he says he began wondering about his appeal. On its face, there is nothing particularly odd about these events, as described by McGee. However, we must recall that he claims these events occurred at the same time he thought his attorney, Schultz, was currently representing him in the appeal they had agreed to file. This is a difficult set of circumstances to believe. Specifically, if he had truly thought that his own lawyer was appealing his case, McGee would have had little need to do legal research on his own. It makes little sense to have been doing legal research in the prison law library about "what to do with my case" at the same time he claimed he was represented by counsel in his appeal. As a general rule, people who have criminal lawyers representing them do not need to do their own research, especially research about something so fundamental as "what to do with my case." Simply put, the fact that he was doing his own legal research at that time is strongly suggestive of the fact that he did *not* believe he had a lawyer working on any appeal, and the reason he did not believe that is because they had never firmly decided to take that step and certainly had not discussed any specific legal issues to appeal. McGee's story, in short, does not

7

hold up.

**III. Conclusion**

For the reasons given above, I conclude that the Petitioner did not instruct his trial attorney to file an appeal. Accordingly, counsel was not ineffective. The petition under § 2255 is therefore **DENIED**. I further certify that a certificate of appealability will not issue because reasonable jurists would not debate the outcome of these proceedings, and the Petitioner has not established the denial of any constitutional right.

**SO ORDERED** this 27th day of March, 2017.

/s William C. Griesbach
William C. Griesbach, Chief Judge
United States District Court